**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

JACQUELINE S.,[1]

Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

Case No. 2:25-cv-00389

Magistrate Judge Caroline H. Gentry
(by full consent of the parties)

## DECISION AND ORDER

Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income in February 2022. Plaintiff's claims were denied initially and upon reconsideration. After a hearing at Plaintiff's request, the Administrative Law Judge (ALJ) concluded that Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review. Plaintiff subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision. For the reasons set forth below, this Court **AFFIRMS** the Commissioner's decision.

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

## I. BACKGROUND

Plaintiff asserts that she has been under a disability since February 23, 2020. At that time, she was fifty-six years old and was considered a "person of advanced age." 20 C.F.R. §§ 404.1563(e), 416.963(e).[2] She subsequently changed age categories to a "person closely approaching retirement age." *Id.* Plaintiff has a "high school education and above." 20 C.F.R. § 404.1564(b)(4).

The evidence in the Administrative Record ("AR," Doc. No. 7) is summarized in the ALJ's decision ("Decision," Doc. No. 7-3 at PageID 110-31), Plaintiff's Statement of Errors ("SE," Doc. No. 8), and the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 10). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II. STANDARD OF REVIEW

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

---

[2] The remaining citations will identify only the pertinent Disability Insurance Benefits Regulations, as they are similar in all relevant respects to the corresponding Supplemental Security Income Regulations.

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "[W]hether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id.*

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the

ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III. FACTS

### A. The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's applications for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520. The ALJ made the following findings of fact:

Step 1: Plaintiff has not engaged in substantial gainful activity since February 23, 2020, the alleged onset date.

Step 2: She has the severe impairments of dizziness, rheumatoid arthritis, arthritis of the thoracic spine, arthritis of both knees, left lateral meniscus tear, diabetes, obesity, and osteopenia.

She has the nonsevere impairments of migraines, kidney stones, asthma, gastroesophageal reflux disease, hypertension, high cholesterol/hyperlipidemia, and anxiety.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity (RFC), or the most she can do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of light work as defined in 20 C.F.R. § 404.1567(b), subject to the following limitations: "[Plaintiff] is limited to standing and walking 4 hours out of an 8-hour workday; occasional use of foot controls with the left foot; occasional climbing ramps and stairs; no climbing of ladders, ropes, and scaffolds; frequent stooping; occasional balancing, kneeling, and crouching; no crawling; and must avoid workplace hazards such as unprotected heights and machinery."

She is able to perform her past relevant work as a collections clerk, as the job is actually performed in the national economy.

(Decision, Doc. No. 7-3 at PageID 115-24.) These findings led the ALJ to conclude that Plaintiff does not meet the definition of disability. (*Id.* at PageID 1124-25.)

## B. Migraine Headaches

### 1. Disability reports and hearing testimony

Plaintiff alleged that she is disabled by several physical and mental impairments, including migraine headaches. (AR, Doc. No. 7-6 at PageID 327, 351.) Plaintiff testified during the October 2023 hearing that she experienced daily migraine headaches despite taking medication. (AR, Doc. No. 7-2 at PageID 55.)

### 2. Medical records

The record documented a remote emergency room visit for a headache and vertigo in March 2016. (AR, Doc. No. 7-9 at PageID 832.)

In March 2019, approximately eleven months before the February 2020 alleged disability onset date, Plaintiff sought emergency room treatment and complained of "waxing and waning headaches for the last [two] months but worse over the last few weeks." (AR, Doc. No. 7-8 at PageID 416.) She also complained of intermittent dizzy spells and "blurred vision that waxes and wanes." (*Id.*) A CT scan of the head showed no acute findings, and the attending physician discharged her with instructions to follow up with her primary care provider and a neurologist. (*Id.* at PageID 422.)

Plaintiff again sought emergency room treatment for a headache in August 2019. (*Id.* at PageID 449.) She also complained of light sensitivity and said that her symptoms had lasted "for a couple hours." (*Id.* at PageID 449.) Plaintiff said she had not taken any medication at home prior to going to the emergency department. (*Id.*)

Plaintiff presented to an emergency room with complaints of dizziness a few days after the alleged disability onset date, on February 26, 2020. (AR, Doc. No. 7-8 at PageID 484.) She also reported a headache that had lasted for the past three days. (*Id.* at PageID 491.) A CT angiogram of the head and neck was unremarkable, and Plaintiff was released without being admitted for further evaluation or treatment. (*Id.* at PageID 490, 502-03.)

Plaintiff denied headaches during primary care visits in September and October 2021 and did not mention headaches in December 2021 or January 2022. (AR, Doc. No. 7-9 at PageID 653, 661, 683-85, 689-91.)

During a primary care visit in February 2022, Plaintiff reported daily migraine headaches. (*Id.* at PageID 702.) Plaintiff said that her headaches were accompanied by photophobia and phonophobia, and worsened with "mental exercises such as multiple

questions." (*Id.*) Plaintiff said that she stopped taking Sumatriptan because it caused hallucinations, and that she had tried Ibuprofen and Excedrin "without relief." (*Id.*) Plaintiff's provider prescribed Rizatriptan. (*Id.*)

At a follow-up visit in March 2022, Plaintiff's primary care provider noted that Plaintiff's migraines were "better controlled with use of triptan as needed and treatment of tooth issues." (*Id.* at PageID 707.) Plaintiff said that she felt sleepy when she took the medication but that she overall "does ok[ay]." (*Id.* at PageID 708.) Plaintiff also said that she did "not feel like she needs to start on daily [medication] at this point." (*Id.*)

In April 2022, Plaintiff reported headaches associated with an upper respiratory tract infection. (*Id.* at PageID 711.) However, Plaintiff's primary care provider did not mention migraines in the progress note. (*Id.* at PageID 711-17.)

Plaintiff did not complain of migraines in September or October of 2022. (AR, Doc. No. 7-9 at PageID 761-63, 768-70.) Plaintiff denied headaches during an ENT visit in November 2022. (*Id.* at PageID 822.) Later that month, Plaintiff's primary care provider noted that Plaintiff's migraines were "chronic, stable with as[-]needed use of triptan." (*Id.* at PageID 894.) Plaintiff denied headaches at another ENT visit in March 2023. (AR, Doc. No. 7-10 at PageID 1009.)

Plaintiff sought emergency room treatment for a headache several months later in August 2023. (AR, Doc. No. 7-11 at PageID 1442.) She reported a history of migraine headaches but said that "this [one] is a little different and that it has not gone away" since she returned from North Carolina after attending a family reunion. (*Id.*) Plaintiff's Glasgow Coma Scale (GCS) subscores ranged from four to six, but a CT angiogram of

the head and neck was again normal. (*Id.* at PageID 1446, 1455-56.) Plaintiff's headache improved after she received a "migraine cocktail" of several medications, and she was released in good condition without being admitted for further treatment. (*Id.* at PageID 1447.) Neurological examinations during this time period were otherwise normal. (*See, e.g.,* AR, Doc. No. 7-9 at PageID 645, 654-55, 664-65, 672-73, 684-85, 691, 703-04, 708-09, 715, 762-63, 770, 895; Doc. No. 7-10 at PageID 1097-98.)

### 3. The ALJ's decision

At Step Two, the ALJ concluded that migraine headaches are not a "severe" impairment as defined in 20 C.F.R. § 404.1520(c). (Decision, Doc. No. 7-3 at PageID 116.) The ALJ explained that Plaintiff's migraines were "helped with medication" and cited several records. (*Id.*) The ALJ did not specifically mention migraine headaches at Step Three, but he addressed Listing 11.02 and concluded that "[Plaintiff's] impairments, considered singly and in combination, do not meet or medically equal the severity requirements of any listed impairment." (*Id.* at PageID 117-18.)

In the RFC analysis, the ALJ summarized the applicable legal standard for evaluating Plaintiff's subjective complaints and stated: "[T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." (Decision, Doc. No. 7-3 at PageID 119.) The ALJ also noted that he was required to "consider all of [Plaintiff's] impairments, including impairments that are not severe" when formulating

the RFC. (*Id.* at PageID 115 (citing 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling (SSR) 96-8p).)

Next, the ALJ summarized some of Plaintiff's subjective complaints and acknowledged that Plaintiff testified to "pain and migraines, despite taking medication for her migraines." (Decision, Doc. No. 7-3 at PageID 120.) The ALJ concluded that although Plaintiff's impairments could reasonably be expected to cause some of her alleged symptoms, the "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at PageID 122.) The ALJ provided several reasons to support his conclusion:

> ***Her ailments are managed by medication and some issues, like her migraines, have been present for years*** (3F/74; 5F/63, 64). Her testimony that pain prevents her from daily activities or venturing out are contradicted by her testimony that she can shop, drive, participate with family, and statements to her providers that she recently returned from a family reunion (Hearing Testimony; 26F/63; 28F/72). Overall, the record does not support her statements regarding the debilitating effects of her impairments.

(*Id.* (emphasis added).)

The ALJ also addressed migraines when he evaluated the prior administrative findings of state agency medical consultant Abraham Mikalov, M.D. (*Id.* at PageID 123.) The ALJ explained that the exertional and environmental limitations that Dr. Mikalov identified (for the time period from the alleged disability onset date to April 15, 2022) were "consistent with her asthma, ***migraines (5F/63, 75; 14F/8; 17F/5; 26F/63)***; hypertension (3F/18; 67; 7F/1; 28F/178); and high cholesterol/hyperlipidemia (3F/18,38, 140; 28F/129); her history of stomach ulcers (3F/134; 13F/2; 17F/1; 23F/7, 10), episodic

dizziness (3F/9, 89, 92, 100), nephrolithiasis (5F/25; 25F/19), arthrosis of her right knee (3F/202), and borderline morbid obesity (5F/15; 23).” (*Id.* (emphasis added).)

Finally, the ALJ summarized why he included certain limitations in the RFC. (Decision, Doc. No. 7-3 at PageID 123.) He did not mention migraines and attributed the environmental limitations to Plaintiff’s “history of dizziness.” (*Id.*)

### C. VE Testimony

The ALJ asked the vocational expert (VE) who testified at the October 2023 hearing whether an individual with Plaintiff’s vocational profile (i.e., the same age, education, and work history) and the RFC identified in the decision could perform any of Plaintiff’s past relevant work. (AR, Doc. No. 7-2 at PageID 61-62.) The VE stated that such an individual could perform Plaintiff’s past relevant work as a collections clerk (*Id.* at PageID 62.)

In response to an additional hypothetical posed by the ALJ, the VE testified that an individual with the ALJ’s RFC but with additional limitations—for sedentary-level lifting, standing, and walking and for the allowance to “use a cane when walking but could carry up to the exertional limits in the other hand”—would still be able to perform Plaintiff’s past relevant work as a collections clerk. (*Id.* at PageID 62-63.) The VE further testified that even if an individual would be “unable to carry anything in the other hand” when using a cane, Plaintiff’s past relevant work as a collections clerk could still be performed. (*Id.* at PageID 63.) The VE explained: “[I]n my professional experience, most sedentary positions would stay at your desk, and you don’t have to carry anything around. Or if it is, it’s minimal.” (*Id.*)

## IV. LAW AND ANALYSIS

### A. Plaintiff's Assignments of Error

Plaintiff asserts two assignments of error. (SE, Doc. No. 8 at PageID 1631-37.) First, Plaintiff contends that the ALJ's RFC is not supported by substantial evidence. (*Id.* at PageID 1631-35.) According to Plaintiff, "[t]he evidence of record does not support the ALJ's determination that [Plaintiff] is capable of performing light work." (*Id.* at PageID 1634.) Second, Plaintiff asserts: "The ALJ erred in finding [Plaintiff's] migraines were non-severe and 'helped with medication,' without conducting the structured analysis mandated by Social Security Ruling (SSR) 19-4p." (*Id.* at PageID 1635.) Plaintiff further asserts that the ALJ failed to consider whether Plaintiff's migraines, either alone or in combination with other impairments, medically equaled a listing pursuant to SSR 19-4p. (*Id.*). For the reasons discussed below, the Court concludes that these arguments are not well-taken and further concludes that the ALJ's findings are supported by substantial evidence and should be affirmed.

### B. The ALJ Did Not Reversibly Err When Assessing Plaintiff's RFC.

#### 1. Applicable legal framework

Determination of the RFC is a task reserved for the ALJ. 20 C.F.R. § 404.1546(c); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("[T]he ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an 'assessment of his [RFC]'"). A claimant's RFC describes the most she can do in a work setting despite her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). When formulating the RFC, the ALJ must consider the claimant's

"ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4).

The ALJ must base the RFC on all relevant evidence in the record, including the claimant's descriptions of her limitations and symptoms, objective medical evidence, medical opinions, other medical evidence, evidence from non-medical sources, and prior administrative medical findings. *See* 20 C.F.R. § 404.1545(a)(1)-(5). An ALJ may also rely on the testimony of a vocational expert. 20 C.F.R. §§ 404.1560(b)(2), 404.1566(e). "Substantial evidence may be produced through reliance on the testimony of a VE in response to a 'hypothetical' question, but only 'if the question accurately portrays [Plaintiff's] individual physical and mental impairments.'" *Varley v. Sec'y of Health and Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

**2. The ALJ's RFC is supported by substantial evidence.**

Plaintiff contends that the ALJ erred by limiting Plaintiff to light exertion. (SE, Doc. No. 8 at PageID 1631-35.) Specifically, Plaintiff challenges the ALJ's conclusion that Plaintiff is capable of sustaining the standing and walking required to perform light work. (*Id.* at PageID 1633-34.) Plaintiff further asserts: "This cannot be considered harmless error, as a determination that [Plaintiff] was capable of sedentary work, may have resulted in a finding of disabled pursuant to the GRID rules." (*Id.* at PageID 1635.) To support her argument, Plaintiff cites her subjective complaints, diagnoses, and some medical records. (*Id.* at PageID 1634.)

However, the substantial evidence standard precludes this Court from weighing the evidence and deciding whether the preponderance of the evidence would support a

different conclusion. *Biestek*, 139 S. Ct. at 1154. Instead, this Court is limited to determining whether the ALJ's findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.

Here, the Court concludes that the ALJ's findings with respect to the RFC are supported by substantial evidence. The ALJ acknowledged many of Plaintiff's subjective complaints which included allegations of back and knee pain, migraine headaches, dizziness, difficulty with exertional activities such as standing and walking, and difficulty with activities of daily living. (Decision, Doc. No. 7-3 at PageID 120.) He also acknowledged Plaintiff's testimony that she experienced migraine headaches despite taking medication, and that she used a cane to stand and ambulate, due to a fear of falling without it. (*Id.*)

The ALJ summarized Plaintiff's treatment for her physical conditions. (Decision, Doc. No. 7-3 at PageID 120-22.) The ALJ acknowledged that a provider diagnosed rheumatoid arthritis as early as 2012, several years prior to the alleged disability onset date, and that she has been prescribed medication for the condition. (Decision, Doc. No. 7-3 at PageID 120.) The ALJ cited x-rays from November 20211 and September 2022 that documented osteopenia. (*Id.* at PageID 121.) The ALJ acknowledged that thoracic spine x-rays in 2021 showed levocurvature with multilevel degenerative changes. (Decision, Doc. No. 7-3 at PageID 120.) The ALJ also stated that right knee x-rays in November 2021 showed mild tricompartmental arthritis, and that left knee x-rays and an MRI in late 2022 showed a lateral meniscus tear and osteoarthritis, most severe at the patellofemoral compartment. (*Id.* at PageID 120-21.)

The ALJ cited Plaintiff's treatment for her pain complaints, which included physical therapy and bilateral knee injections. (*Id.* at PageID 121.) The ALJ acknowledged that Plaintiff's medical providers documented physical examination abnormalities that included moderate crepitus and tenderness to palpation of the knees, as well as pain with flexion and extension of the knees. (*Id.* at PageID 120-22.) Yet the ALJ also noted that physical examinations also showed some normal findings, such as no tenderness, full strength, full range of motion of the knee, no sensory deficits, and a normal gait (*Id.*)

The ALJ also acknowledged that a provider diagnosed diabetes in 2020, and that the condition was controlled without medication or long-term use of insulin. (Decision, Doc. No. 7-3 at PageID 121.) Additionally, the ALJ addressed Plaintiff's complaints of dizziness but stated that scans of the head and neck that were taken prior to and during the time period at issue were negative for abnormalities. (*Id.*)

The ALJ addressed Plaintiff's testimony that she needs a cane for ambulation due to balance difficulties, and concluded that Plaintiff's use of a cane is "not medically necessary." (Decision, Doc. No. 7-3 at PageID 122.) The ALJ reasoned:

> The record is devoid of any documentation from a medical source that supports the need for an assistive device for a continuous period of at least 12 months. Moreover, there is no evidence establishing the need for a hand-held assistive device to aid in walking or standing and describing the circumstances for which it is needed. Treatment notes reflect that [Plaintiff] used a cane at times (26F/226; 27F/11, 16, 28); but her gait was noted as normal at other times (13F/2; 26F/25; 28F/34).

(*Id.*)

The ALJ concluded that the balance of the objective and other evidence did not support Plaintiff's allegations of symptom severity. (Decision, Doc. No. 7-3 at PageID 122.) He explained that Plaintiff's allegations about her limitations were not fully consistent with the objective medical evidence and other evidence in the record. (*Id.*) The ALJ accounted for this evidence by limiting Plaintiff to the reduced range of light work in the RFC. (*Id.* at PageID 123.) The ALJ also explained why he included certain limitations in the RFC:

> Based on the foregoing, the undersigned finds [Plaintiff] has the above residual functional capacity assessment, which is supported by limiting her exertional level to reduced light with stand/walk limitations because of the arthritis in her back and knees; limited use of occasional foot controls on her left and only occasional balancing, kneeling and crouching with no crawling because of the meniscal tear and [Plaintiff's] documented arthritis and osteopenia; and only frequent stooping because of her obesity and thoracic arthritis. [Plaintiff's] history of dizziness supports the environmental limitations found in the residual functioning capacity as well.

(*Id.*)

Because these conclusions are supported by substantial evidence, the ALJ did not err by failing to include additional limitations in the RFC. Again, the Court notes that it is not permitted to re-weigh the evidence and determine whether it would also support a different conclusion. *Biestek*, 139 S. Ct. at 1154.

The Court finds that the medical opinion evidence also provides substantial evidence to support the ALJ's conclusions.[3] The ALJ explained that he was persuaded by the assessment of state agency medical consultant Abraham Mikalov, M.D. (Decision,

[3] Plaintiff did not challenge the ALJ's evaluation of the opinion evidence. (*See* SE, Doc. No. 8.)

Doc. No. 7-3 at PageID 122-23.) Dr. Mikalov reviewed the record and completed a Disability Determination Explanation form at the reconsideration level in December 2022. (AR, Doc. No. 7-3 at PageID 91-95.) Dr. Mikalov opined that from the alleged disability onset date until April 15, 2022, Plaintiff had the following limitations: lifting and/or carrying up to twenty pounds occasionally and ten pounds frequently; standing and/or walking for approximately six hours in an eight-hour workday; sitting for approximately six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and avoid all exposure to hazards, including working around unprotected heights and hazardous machinery. (*Id.* at PageID 92-93.)

Dr. Mikalov opined that beginning on April 16, 2022 Plaintiff was further limited to standing and/or walking for a total of no more than four hours in an eight-hour workday. (*Id.* at PageID 93.) He also identified the following postural and environmental limitations: never crawl or climb ladders, ropes, or scaffolds; occasionally kneel, crouch, and climb ramps or stairs; frequently balance and stoop; and avoid even moderate exposure to hazards, with no heavy moving machinery or unprotected heights. (*Id.* at PageID 94.) Further, Dr. Mikalov explained why he recommended these limitations and how they accounted for Plaintiff's migraines, dizziness, spine and bilateral knee conditions, and obesity. (*Id.* at PageID 91-94.)

The ALJ's analysis of the persuasiveness of Dr. Mikalov's opinion complied with 20 C.F.R. § 404.1520c. The ALJ addressed the required supportability factor when he explained that Dr. Mikalov supported his recommended RFC limitations (for the time

period prior to April 16, 2022) "with his review of [Plaintiff's] history." (Decision, Doc. No. 7-3 at PageID 123.) The ALJ further explained that Dr. Mikalov's recommended RFC limitations (for the time period beginning on April 16, 2022) were "supported by the additional documentation in the record." (*Id.*) The ALJ addressed the required consistency factor when he found that Dr. Mikalov's recommendations were consistent with the medical records, explaining that for the time period prior to April 16, 2022:

> [T]he prescribed exertional and environmental limits are consistent with her asthma, migraines (5F/63, 75; 14F/8; 17F/5; 26F/63); hypertension (3F/18; 67; 7F/1; 28F/178); and high cholesterol/hyperlipidemia (3F/18,38, 140; 28F/129); her history of stomach ulcers (3F/134; 13F/2; 17F/1; 23F/7, 10), episodic dizziness (3F/9, 89, 92, 100), nephrolithiasis (5F/25; 25F/19), arthrosis of her right knee (3F/202), and borderline morbid obesity (5F/15; 23).

(*Id.*) The ALJ further reasoned that Dr. Mikalov's recommendations for the time period beginning on April 16, 2022 were:

> consistent with additional limitations to the exertional levels reflected in the second residual functional capacity due to [Plaintiff's] torn meniscus (27F/9) evidenced in the September 9, 2022, left knee radiograph (16F/22) and the October 2022 X-rays showing the radial tear of the anterior horn of the lateral meniscus (12F/10). These findings warranted greater exertional limits which are consistent with the record of [Plaintiff's] injury (26F/226; 27F/11, 16, 28).

(*Id.*) The ALJ concluded that Dr. Mikalov's recommendations for the later time period were "more persuasive." (*Id.*)

Taken together, the evidence cited by the ALJ constitutes substantial evidence — that is, "relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (*Biestek*, 139 S. Ct. at 1154) — that supports the ALJ's RFC. Because the

ALJ's findings are supported by substantial evidence, they cannot be disturbed by this Court even if substantial evidence in the record would support the opposite conclusion.

Plaintiff also argues that the ALJ's decision to limit Plaintiff to the standing and walking requirements in the RFC "cannot be considered harmless error, as a determination that [Plaintiff] was capable of sedentary work, may have resulted in a finding of disabled pursuant to the GRID rules." (SE, Doc. No. 8 at PageID 1635.) However, the inclusion of additional limitations in the RFC to sedentary-level standing and walking—and even lifting—would not have changed the ultimate outcome of the ALJ's decision. Therefore, even if the ALJ erroneously found that Plaintiff could perform the reduced range of light work in the RFC, any such error is, in fact, harmless.

As stated above, the VE testified at the October 2023 hearing that an individual with Plaintiff's vocational profile (i.e., the same age, education, and work history) and the RFC identified in the decision—but with additional limitations for sedentary level-lifting, standing, and walking, and with the allowance to use a cane when walking—would be able to perform Plaintiff's past relevant work as a collections clerk. (AR, Doc. No. 7-2 at PageID 62-63.) Therefore, even if the ALJ had included more restrictive limitations in the RFC to sedentary-level exertion activities, as Plaintiff requests, Plaintiff would still have been able to perform the collections clerk job.

Plaintiff's argument that limitations to sedentary-level exertion "may have resulted in a finding of disabled pursuant to the GRID rules" is also not-well taken. (*See* SE, Doc. No. 8 at PageID 1635.) The regulations permit an ALJ to use vocational expert testimony at Step Four to determine whether a claimant can perform her past relevant work,

considering her RFC. 20 C.F.R. § 404.1560(b)(2); *see also Griffeth v. Comm'r of Soc. Sec*., 217 F. App'x 425, 429 (6th Cir. 2007). Here, the ALJ's RFC and Step Four findings were supported by substantial evidence. Because the ALJ properly found that Plaintiff was not disabled at Step Four, the ALJ was not required to proceed to Step Five of the sequential evaluation process. *See* 20 C.F.R. § 404.1560(b)(3) ("If we find that you have the [RFC] to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will *not* consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy."). Whether Plaintiff would be disabled at Step Five is therefore irrelevant and does not change the ultimate outcome of the ALJ's decision.

For all of these reasons, Plaintiff's challenge to the ALJ's RFC is not well-taken.

### C. The ALJ Did Not Reversibly Err When Analyzing Plaintiff's Migraine Headaches.

#### 1. Applicable legal framework

Social Security Ruling (SSR) 19-4p governs an ALJ's consideration of headache disorders. SSR 19-4p, 2019 WL 4169635 (S.S.A. Aug. 26, 2019). SSR 19-4p provides guidance on how "primary headache disorders" – including migraine headaches – are established and evaluated. *Id.* at *4. It notes that physicians diagnose a primary headache disorder "only after excluding alternative medical and psychiatric causes of a person's symptoms," and "after reviewing a person's full medical and headache history and conducting a physical and neurological examination." (*Id.* at *4.) To rule out other medical conditions, a physician "may also conduct laboratory tests or imaging scans."

(*Id.*) But while such imaging "may be useful ruling out other possible causes of headache symptoms, it is not required for a primary headache disorder diagnosis." (*Id.*) For example: "[P]hysicians may use magnetic resonance imaging (MRI) to rule out other possible causes of headaches—such as a tumor—meaning that an unremarkable MRI is consistent with a primary headache disorder diagnosis." (*Id.*)

The SSR also lists the types of objective evidence that an ALJ will consider when determining whether headaches constitute a medically determinable impairment (MDI) at Step 2. *Id.* at *5-6. The ALJ "will not establish the existence of an MDI based only on a diagnosis or a statement of symptoms" but "will consider the following combination of findings reported by an [acceptable medical source (AMS)]":

- A primary headache disorder diagnosis from an AMS. Other disorders have similar symptoms, signs, and laboratory findings. A diagnosis of one of the primary headache disorders by an AMS identifies the specific condition that is causing the person's symptoms. The evidence must document that the AMS who made the diagnosis reviewed the person's medical history, conducted a physical examination, and made the diagnosis of primary headache disorder only after excluding alternative medical and psychiatric causes of the person's symptoms. In addition, the treatment notes must be consistent with the diagnosis of a primary headache disorder.

- An observation of a typical headache event, and a detailed description of the event including all associated phenomena, by an AMS. During a physical examination, an AMS is often able to observe and document signs that co-occur prior to, during, and following the headache event. Examples of co-occurring observable signs include occasional tremors, problems concentrating or remembering, neck stiffness, dizziness, gait instability, skin flushing, nasal congestion or rhinorrhea (runny nose), puffy eyelid, forehead or facial sweating, pallor, constriction of the pupil, drooping of the upper eyelid, red eye, secretion of tears, and the need to be in a quiet or dark room during the examination. In the absence of direct observation of a typical headache event by an AMS, we may consider a third party

observation of a typical headache event, and any co-occurring observable signs, when the third party's description of the event is documented by an AMS and consistent with the evidence in the case file.

- Remarkable or unremarkable findings on laboratory tests. We will make every reasonable effort to obtain the results of laboratory tests. We will not routinely purchase tests related to a person's headaches or allegations of headaches. We will not purchase imaging or other diagnostic or laboratory tests that are complex, may involve significant risk, or are invasive.

- Response to treatment. Medications and other medical interventions are generally tailored to a person's unique symptoms, predicted response, and risk of side effects. Examples of medications used to treat primary headache disorders include, but are not limited to, botulinum neurotoxin (Botox®), anticonvulsants, and antidepressants. We will consider whether the person's headache symptoms have improved, worsened, or remained stable despite treatment and consider medical opinions related to the person's physical strength and functional abilities. When evidence in the file from an AMS documents ongoing headaches that persist despite treatment, such findings may constitute medical signs that help to establish the presence of an MDI.

*Id.* at *6.

At Step 3, SSR 19-4p indicates that a primary headache disorder is not a listed impairment. 2019 WL 4169635, at *7. However, a listing is medically equaled if "a primary headache disorder, alone or in combination with other impairment(s), medically equals a listing." *Id.* The SSR instructs that Listing 11.02 (paragraph B or D for dyscognitive seizures) is the "most closely analogous listed impairment" for an MDI of a primary headache disorder. *Id.* In pertinent part, this Listing describes:

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C). . . .

*****

> D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
>
> 1. Physical functioning (see 11.00G3a); or
> 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
> 3. Interacting with others (see 11.00G3b(ii)); or
> 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> 5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § Part 404, Subpt. P, App. 1, § 11.02.

In determining whether a primary headache disorder is equivalent to Listing 11.02B, the ALJ is required to consider:

> [a] detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7. To determine whether a primary headache disorder is equal in severity to Listing 11.02D, the ALJ should consider the 11.02B factors, as well as whether the overall effects of the primary headache disorder result in marked limitation of functioning in the five areas identified above. *Id.*

SSR 19-4p also directs the ALJ how to consider headaches when assessing the RFC:

> We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC. The RFC is the most a person can do despite his or her limitation(s). We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

*Id.* at *7-8.

**2. The ALJ's analysis of Plaintiff's migraines complied with the applicable regulations and is supported by substantial evidence.**

Plaintiff asserts that the ALJ erred because he concluded that Plaintiff's migraines were nonsevere "without conducting the structured analysis mandated by [SSR] 19-4p," and because he failed to consider whether Plaintiff's migraines medically equaled a listed impairment. Thes assertions are not well-taken, because the ALJ complied with applicable regulations and his conclusions are supported by substantial evidence.

The ALJ concluded at Step Two that Plaintiff's migraines were nonsevere, and reasoned that Plaintiff's migraines were "helped with medication." (Decision, Doc. No. 7-3 at PageID 116.) Plaintiff argues that the ALJ's Step Two conclusion is "superficial" and "violates the requirement in SSR 19-4p to consider longitudinal symptoms, treatment side effects (such as drowsiness or impaired focus), and functional impact." (SE, Doc. No. 8 at PageID 1636.) This argument is not persuasive.

As an initial matter, the Sixth Circuit has not identified the level of articulation required for an ALJ to adequately explain his consideration of the severity of migraine headaches at Step Two pursuant to SSR 19-4p. Additionally, as a general rule the ALJ's decision "need not be so comprehensive as to account with meticulous specificity for each finding and limitation, nor is the ALJ required to discuss every piece of evidence in the record." *Correa v. Comm'r of Soc. Sec.*, No. 1:23-cv-685, 2023 U.S. Dist. LEXIS 231766, at *31 (N.D. Ohio Dec. 14, 2023) (citing *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). Nevertheless, the ALJ's "factual findings as a whole" must show that he "implicitly resolved the conflicts in the evidence." *Smith-Johnson*, 579 F. App'x at 437 n.11. The ALJ did so in this case.

When the ALJ concluded at Step Two that Plaintiff's migraines were nonsevere, he reasoned that Plaintiff's migraines were "helped with medication." (Decision, Doc. No. 7-3 at PageID 116.) He cited several records by way of example to support his finding. (Decision, Doc. No. 7-3 at PageID 116.) The Court finds that the ALJ was not required to do more.

Additionally, substantial evidence supports the ALJ's conclusion that Plaintiff's migraines were nonsevere. Plaintiff sought emergency room treatment for a headache a few days after the alleged disability onset date. (AR, Doc. No. 7-8 at PageID 484.) But a CT angiogram of the head and neck was unremarkable, she was released without being admitted for further treatment. (*Id.* at PageID 490, 502-03.) The record documented no further migraine complaints until almost a year later. Significantly, Plaintiff denied

headaches during primary care visits in September and October of 2021, and she made no mention of headaches in December 2021 and January 2022. (AR, Doc. No. 7-9 at PageID 653, 661, 683-85, 689-91.) Not until February 2022 did Plaintiff complain of daily migraine headaches, and Plaintiff's primary care provider prescribed Rizatriptan to address her complaints. (*Id.* at PageID 702.)

Subsequent records provide substantial evidence to support the ALJ's conclusion that Plaintiff's migraines were "helped with medication." (Decision, Doc. No. 7-3 at PageID 116.) At the next primary care visit in March 2022, Plaintiff's primary care provider noted that Plaintiff's migraines were "better controlled with use of triptan as needed and treatment of tooth issues." (AR, Doc. No. 7-9 at PageID 707.) Moreover, Plaintiff said that she did not feel like she needed to start on daily medication for her migraines. (*Id.* at PageID 708.)

Although Plaintiff complained of headaches in April 2022, they were associated with an upper respiratory tract infection and Plaintiff's provider did not mention migraines in the progress note. (AR, Doc. No. 7-9 at PageID 711-17.) The record only documented sporadic references to migraines after that time. For example, Plaintiff's primary care provider noted in November 2022 that Plaintiff's migraine headaches were "chronic, stable with as[-]needed use of triptan." (*Id.* at PageID 894.) Not until approximately nine months later, in August 2023, did Plaintiff seek emergency room treatment for another headache. (AR, Doc. No. 7-11 at PageID 1442.) A CT angiogram of the head and neck was again normal, and her headache improved after she received a "migraine cocktail" that consisted of several medications. (*Id.* at PageID 1447, 1455-56.)

No further headache complaints or treatment for headaches were documented after that time, and she specifically denied headaches when she sought emergency room treatment for hypertension-related dizziness in September 2023. (AR, Doc. No. 7-10 at PageID 1089.)

All of this evidence supports the ALJ's conclusion that Plaintiff's migraines are nonsevere. Because the ALJ's conclusion is supported by substantial evidence, it cannot be disturbed by this Court even if substantial evidence in the record would support the opposite conclusion. *Key*, 109 F.3d at 273.

But even if the ALJ erroneously concluded that Plaintiff's migraines are nonsevere, any such error would be harmless because the ALJ considered Plaintiff's migraines in the remaining steps of the sequential evaluation. *See Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir.1987) (if an ALJ finds at least one severe impairment and "considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'"). In other words, if the ALJ "finds at least one severe impairment and analyzes all impairments in the following steps, the characterization of other impairments as severe or nonsevere is 'legally irrelevant.'" *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 817 (6th Cir. 2020) (quoting *Anthony*, 266 F. App'x at 457 (6th Cir. 2008)). And in this case, the ALJ demonstrated that he considered Plaintiff's migraines in the remaining steps of the disability evaluation.

Plaintiff challenges the ALJ's Step Three finding, arguing that the ALJ "did not compare [the evidence] to Listing 11.02 or offer any equivalence analysis, in violation of *Reynolds v. Comm'r*, 424 F. App'x 411, 416 (6th Cir. 2011) (remand required where ALJ failed to evaluate evidence under the relevant listing)." (SE, Doc. No. 8 at PageID 8.) *Reynolds*, however, is distinguishable. The ALJ in *Reynolds* found "back pain" to be a severe impairment at Step Two. 424 F. App'x at 416. At Step Three, the ALJ only summarily concluded that the plaintiff did not have an impairment or combination of impairments that met Listing section 1.00. *Id.* The *Reynolds* court concluded that the ALJ erred because: "No analysis whatsoever was done as to whether [the plaintiff's] physical impairments (all summed up in his finding of a severe 'back pain' impairment) met or equaled a Listing under section 1.00, despite [the ALJ's] introduction concluding that they did not." *Id.*

Here, however, the ALJ evaluated Listing section 11.02 pursuant to SSR 19-4p. The ALJ provided a detailed explanation of the evidentiary requirements set forth in Listing 11.02. (Decision, Doc. No. 7-3 at PageID 117-18.) The ALJ concluded: "The medical evidence in this case does not indicate that [Plaintiff] suffers from generalized tonic-clonic seizures or dyscognitive seizures as described above." (*Id.* at PageID 118.) The ALJ also reasoned that "[n]o treating or examining medical source has recorded objective clinical or diagnostic findings that are the same as or medically equivalent to the criteria of any listed impairment." (*Id.* at PageID 117.) This explanation supports the ALJ's ultimate conclusion that "[Plaintiff's] impairments, considered singly and in

combination, do not meet or medically equal the severity requirements of any listed impairment." (*Id.* at PageID 117.)

What is more, the Sixth Circuit found no reversible error in an ALJ's Step Three analysis related to primary headache disorders even when "[t]he ALJ did not specifically cite Listing 11.02 in his decision." *Snyder v. Comm'r of Soc. Sec.*, No. 22-5948, 2023 WL 3673265, at *4 (6th Cir. May 26, 2023). The ALJ in *Snyder* stated that he "considered the claimant's impairments under the provisions of listings 11.00 (Neurological Disorders) and found that the claimant's conditions do not meet or medically equal the criteria of the listed impairments." *Id.* at *2. The *Snyder* court concluded: "We are therefore satisfied that the ALJ evaluated whether [the plaintiff's] migraine headaches equaled Listing 11.02." *Id.* at *4 (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). The ALJ in this case did more than the ALJ in *Snyder*. And so this Court concludes that the ALJ did evaluate Plaintiff's migraines under Listing 11.02.

The Court also finds that substantial evidence supports the ALJ's conclusion that Plaintiff's migraine headaches do not equal Listing 11.02. The Sixth Circuit's decision in *Snyder* supports this conclusion, too. The *Snyder* court pointed out that the plaintiff did "not direc[t] us to a statement from an acceptable medical source that complies with SSR 19-4p, i.e., one that provides a detailed description of a typical migraine event, the side effects of her medications, and, most importantly, an opinion concerning the limitations in functioning associated with her migraines." 2023 WL 3673265, at *4. The court also cited statements from state agency reviewing physicians and other medical evidence to

affirm the ALJ's conclusion that the plaintiff's neurological impairments did not equal Listing 11.02. *Id.*

Similarly, Plaintiff in this case has not provided such a statement from an acceptable medical source. Instead, Plaintiff states: "[Plaintiff's] medical records document repeated migraines with photophobia, phonophobia, nausea, dizziness, and visual disturbances. Tr. 389, 394, 672, 675, 679, 684, 1412. Her symptoms occurred despite medication and were functionally disruptive." (SE, Doc. No. 8 at PageID 1636 (citing AR, Doc. No 7-8 at PageID 416, 421; Doc. No. 7-9 at PageID 700, 703, 707, 712; Doc. No. 7-11 at PageID 1442).) Plaintiff's summary, however, mischaracterizes the medical records related to migraines, because the record documents only sporadic complaints of migraine headaches and related symptoms. For example, Plaintiff cites only one treatment record that documented complaints of visual disturbances, and that record was from an emergency room visit that occurred almost a year prior to the alleged disability onset date. (*Id.* (citing AR, Doc. No. 7-8 at PageID 416, 421).) Plaintiff only complained of visual disturbance (in the form of photophobia) on one other occasion after the February 2020 alleged disability onset date. (AR, Doc. No. 7-9 at PageID 702.) Moreover, Plaintiff's provider prescribed a new medication at that time. (*Id.*) And as discussed above, subsequent records indicate that this medication was effective at controlling Plaintiff's symptoms.

For example, at a follow-up visit one month later in March 2022, Plaintiff's provider noted that migraines were "better controlled." (*Id.* at PageID 707.) Significantly, Plaintiff declined a daily migraine medication. (*Id.* at PageID 708.) Plaintiff's provider

noted in November 2022 that Plaintiff's migraines were "stable" with only as-needed use of Rizatriptan. (*Id.* at PageID 894.) Plaintiff sought emergency room treatment for another headache in August 2023, but the record otherwise documents no further headache complaints or treatment for headaches after that time.

Further, the state agency reviewing physicians concluded that Plaintiff's impairments, including migraines, did not meet or equal the requirements of any Listed impairments. (AR, Doc. No. 7-3 at PageID 72, 91.) For these reasons, the Court finds that the ALJ adequately addressed Plaintiff's migraines at Step Three, and his Step Three conclusion is supported by substantial evidence.

The ALJ also considered Plaintiff's migraines in the RFC analysis. The ALJ acknowledged Plaintiff's testimony that she experienced "pain and migraines, despite taking medication for her migraines." (Decision, Doc. No. 7-3 at PageID 120.) The ALJ found that on balance, the evidence did not support Plaintiff's allegations of symptom severity. (*Id.* at PageID 122.) The ALJ cited Plaintiff's migraine headaches as one reason to support this conclusion: "Her ailments are managed by medication and some issues, like her migraines, have been present for years (3F/74; 5F/63, 64)." (*Id.*)

The ALJ further addressed Plaintiff's migraines when he evaluated the prior administrative findings of state agency medical consultant Dr. Mikalov. (Decision, Doc. No. 7-3 at PageID 122-23.) The ALJ explained that the exertional and environmental limitations identified by Dr. Mikalov for the time period prior to April 16, 2022 were "consistent with" several of Plaintiff's impairments, including her migraines and episodic

dizziness.[4] (*Id.* at PageID 123.) Additionally, in his conclusory paragraph that summarized why he included the limitations in the RFC, the ALJ stated: "[Plaintiff's] history of dizziness supports the environmental limitations found in the residual functioning capacity as well." (*Id.*)

In sum, the Court finds that the ALJ considered Plaintiff's migraines by limiting Plaintiff to the reduced range of light work in the RFC. (Decision, Doc. No. 7-3 at PageID 119.) Any error in classifying the migraines as nonsevere is therefore harmless.

## V. CONCLUSION

For the reasons discussed above, the ALJ properly applied the governing legal framework and substantial evidence supports his conclusions. The ALJ therefore did not err by failing to include additional limitations in the RFC to further account for Plaintiff's impairments. Plaintiff's assertions to the contrary are without merit and are overruled.

**IT IS THEREFORE ORDERED THAT**:

1. Plaintiff's Statement of Errors (Doc. No. 8) is OVERRULED;
2. The Court AFFIRMS the Commissioner's non-disability determination; and;
3. The case is terminated on the Court's docket.

*/s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

[4] The ALJ further explained that he adopted the more-restrictive limitations identified by Dr. Mikalov for the time period after April 16, 2022 to account for additional evidence related to Plaintiff's left knee condition. (AR, Doc. No. 7-3 at PageID 123.)